**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ENVOY CORPORATION and FEDERAL INSURANCE COMPANY,** ) ) ) | |
| **Plaintiffs,** ) | |
| ) | **No. 3:03cv0539** |
| **v.** ) | |
| ) | |
| ) | **Senior Judge Thomas A. Wiseman, Jr.** |
| **QUINTILES TRANSNATIONAL CORP.** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

Plaintiffs Envoy Corporation ("Envoy") and Federal Insurance Company ("Federal)" (collectively, "Plaintiffs") filed their Complaint on June 13, 2004 seeking damages for breach of contract and related claims.  Plaintiffs filed their Motion for Summary Judgment and Memorandum in Support thereof (Docs. Nos. 17 & 18) on July 18, 2003.  Defendant Quintiles Transnational Corporation ("Quintiles") thereafter filed its Motion to Dismiss and Memorandum of Law in support thereof (Docs. Nos. 25 &26) on July 21, 2003.  The parties each filed a response to the respective motions.  Plaintiffs filed a motion for consolidated hearing on Plaintiffs' Motion for Summary Judgment and Defendant Quintiles Motion to Dismiss on January 7, 2004.  On February 24, 2004, Judge John T. Nixon granted the parties joint motion to suspend discovery and other pre-trial deadlines pending the Court's ruling on the parties' dispositive motions.

On October 20, 2005, the case was reassigned to this Court.  By the Court's Order entered on October 24, 2005 (Doc. No. 58) and Fed. R. Civ. P. 12(b), Defendant's Motion to Dismiss (Doc. No. 25) was converted to a Motion for Summary Judgment and the parties were given time to supplement their motions for summary judgment.  By that Order, the Court reserved its decision on Plaintiffs' Motion for Consolidated Hearing until the parties filed any supplemental briefing on the pending motions.  On November 14, 2005, Quintiles filed its Memorandum of Law in Support of its Motion for Summary Judgment (Doc. No. 62) and Plaintiffs filed their Supplement Brief in support of Plaintiffs' Motion for

1

Summary Judgment and in opposition to Defendant Quintiles' Motion to Dismiss (Doc. No. 64).

On December 2, 2005, the Court granted Plaintiffs' Motion for Leave to file a response to Defendant Quintiles' Supplemental Brief. The Court granted Plaintiffs' Motion for Consolidated Hearing on the parties' motions on March 29, 2006 and the Court heard oral arguments on all pending motions on April 18, 2006. The motions were then taken under advisement.

For the reasons set forth below, the Court will GRANT Defendant Quintiles' Motion for Summary Judgment in so far as it pertains to claims brought by Plaintiff Envoy. Therefore, the Court DENIES Plaintiff Envoy's Motion for Summary Judgment as MOOT and will dismiss Envoy from the case. The Court will DENY Defendant Quintiles' Motion for Summary Judgment as it pertains to Plaintiff Federal's claims. Therefore, the Court will GRANT Plaintiff Federal's Motion for Summary Judgment, thereby entitling Federal to recovery for Quintiles' breach of the Indemnity Provision of the Merger Agreement.

## II.      FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Envoy is a corporation incorporated under the laws of Delaware with its principal place of business in Nashville, Tennessee. Plaintiff Federal is a corporation incorporated under the laws of Indiana with its principal place of business in New Jersey. Defendant Quintiles is a corporation incorporated under the laws of North Carolina with its principal place of business in Durham, North Carolina.

### A.      The Federal Insurance Policy

In 1996, Federal issued Executive Protection Policy No. 8141-48-73A (the "Federal Policy" or the "Policy") to Envoy for the Policy Period October 1, 1996 to October 1, 1998. The Deductible Amount under the Policy was $500,000. The limit of liability under the Policy was $15 million. The Policy provided coverage to Envoy for the risk of liability for claims made against Envoy's directors and officers. (Doc. No. 38, at 3) The Policy contained a subrogation provision, which provided: "In the event of any payment under this policy, [Federal] shall be subrogated to the extent of such payment to all the Insured's rights of recovery," and requiring Envoy to "[d]o everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable [Federal] effectively to bring suit in the name of the Insured." (Federal Policy, General Terms § 7)

It is undisputed that Envoy purchased the Policy before the Envoy Securities Litigation was filed and

before either Quintiles or WebMd acquired Envoy. Thus, at the time the Federal Policy was sold to Envoy in 1996, there was no indemnification obligation of any kind between Quintiles and Envoy.

### B. The Envoy Securities Litigation

On or about August 20, 1998, Envoy was named as a defendant in three purported class actions, filed in the Middle District of Tennessee against Envoy's directors and officers alleging various breaches of duties and other violations. The cases were consolidated and styled as In Re Envoy Corporation Securities Litigation, Case No. 3-98-0760 (the "Envoy Securities Litigation"). Envoy provided notice to Federal of the litigation and initially sought coverage under the Policy for costs associated with the Envoy Securities Litigation. In response, Federal acknowledged this notice and reserved its right to deny coverage for the Envoy Securities Litigation under the Policy and applicable law.

### C. Quintiles Temporarily Acquires Envoy

In 1999, shortly after the Envoy Securities Litigation was filed and Federal received notice of it, Quintiles acquired Envoy as a subsidiary. During the time Quintiles owned Envoy, Federal was apprized of the progress of the litigation. There is no indication that any other claims were noticed under the coverage of the 1996-1998 Policy at any time. According to Quintiles, the time period to provide notice of a claim under the specific Federal Policy has since expired.

### D. WebMd Acquires Envoy – The Indemnity Provision of the Merger Agreement

Approximately one year later, while the Envoy Securities Litigation was ongoing, Envoy was acquired by and became a wholly-owned subsidiary of Healtheon/WebMD Corporation, now known as WebMd, pursuant to the *Agreement and Plan of Merger Among Healtheon/WebMD Corporation, Pine Merger Corp., Envoy Corporation, Quintiles Transnational Corp., Qfinancial Inc. Dated as of January 22, 2000* (the "Merger Agreement"). According to the Merger Agreement, the agreement and all of its provisions are to be governed by and construed in accordance with North Carolina law. (Merger Agreement, § 11.8).

The Merger Agreement is an agreement between Quintiles, Envoy and WebMD. In connection with this merger, Quintiles received approximately $2.5 billion in cash and securities. At issue in this case is Quintiles' agreement, pursuant to Article 8.16 of the Merger Agreement, to indemnify and hold harmless Envoy from "any and all liabilities" arising out of the Envoy Securities Litigation (the "Indemnity Provision").

3

More specifically, the Indemnity Provision provides in pertinent part: Quintiles hereby agrees to indemnify and hold harmless Envoy and its Subsidiaries from any and all Liabilities arising out of the matters set forth in Section 8.16 of the Envoy Disclosure letter. (Merger Agreement, § 8.6).

Section 8.16 of the Envoy Disclosure Letter specifically identified the subject matter of the indemnity as follows: Indemnification. In Re: Envoy Securities Litigation in the United States District Court, Middle District of Tennessee (Case Number 3-98-0760) (Merger Agreement, § 8.16). Further, Article 11(a) of the Merger Agreement defines "Liability" broadly to mean:

> any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection, and *defense*), claim, deficiency, guaranty, or endorsement, of or by any Person . . . of any type, whether accrued, absolute, *contingent*, liquidated or unliquidated, matured or unmatured or otherwise.

(Merger Agreement, Article 11(a)). Therefore, according to the unambiguous language of the Indemnity Provision, Quintiles agreed to indemnify Envoy for any and all costs associated with the defense and settlement of the Envoy Securities Litigation.

### E. Other Provisions of the Merger Agreement

As to be expected, in addition to the Article containing the Indemnity Provision, the Merger Agreement also contains numerous other Articles and provisions setting forth various disclosures, limitations and terms as to the merger and the parties' rights and obligations after the merger. According to Section 11.3 of the Merger Agreement, the parties intended that the Merger Agreement, including the documents and instruments referred to therein, constitute the entire agreement between the parties with respect to the transactions contemplated thereunder. Moreover, Section 11.3 specifically provided that the Merger Agreement "supersedes all prior arrangements or understandings with respect thereto, written or oral." (Merger Agreement, § 11.3). Therefore, a review of the other provisions of the Merger Agreement is necessary to the Court's analysis of Quintiles' obligation under the Indemnity Provision.

### 1. Obligation to Maintain Insurance Policies

The Merger Agreement contains a provision requiring maintenance of certain insurance policies. Under Section 8.12 of the Merger Agreement, the directors and officers liability insurance maintained by Envoy on the date of the date of the Merger Agreement was to be maintained by WebMD.

4

Healtheon/WebMD agrees that from and after the Effective Time, the Surviving Corporation shall cause the policies of director and officer liability insurance maintained by the Envoy on the date hereof and listed in Section 8.12 of the Envoy Disclosure Letter to be maintained in effect for the period of time directors and officers are entitled to indemnification under Section 8.12(a) above...; may substitute therefor policies of at least the same coverage containing terms and conditions which are no less advantageous to the Indemnified Parties, provided that such substitution shall not result in gaps or lapses of coverage with respect to matters occurring prior to the Effective Time . . . .

(the "Insurance Provision") (Merger Agreement, § 8.12(b)). Section 8.12 of the Envoy Disclosure Letter states that "Section 5.10 of Envoy's Disclosure Letter is incorporated by reference herein and made part hereof."

According to the Merger Agreement, Section 5.10 of the Envoy Disclosure Letter sets forth "[a] complete and accurate list of all insurance polices held by Envoy and then in force (including without limitation, property damage, public liability, communications liability, workers' compensation, fidelity bonds, errors and omissions, theft, forgery and other coverage)" and at the time of the merger, "[t]here [was] no Material claim by Envoy or any of its Subsidiaries pending under any insurance policies of Envoy or any of its Subsidiaries as to which coverage has been questioned, denied or disputed by the underwriters of such policies." (Merger Agreement, § 5.10). Section 5.10 of the Disclosure Letter lists Federal's Policy, Executive Protection Policy No. 8141-48-73A, which covered losses related to actions between 10/1/96 and 10/1/98 up to a limit of $15 million, as well as the subsequent Executive Protection Policy 8141-48-73B, which was in effect at the time of the merger and increased the coverage limitation to $20 million.

### 2. Non-Assignment Provision

Also pertinent to the present case is the fact that the parties to the Merger Agreement included limitations on the assignment of rights under the agreement. Section 11.3 specifically states that nothing in the agreement, either express or implied, was intended to confer any rights upon third parties, while Section 11.6 expressly barred assignment of any rights without consent. (Merger Agreement, § 11.3 & § 11.6).

### 3. Interpretation of Agreement

Moreover, the parties expressly agreed on how the Merger Agreement should be interpreted, stating that:

Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against any party, whether under any rule of construction or otherwise. No party to this Agreement shall be considered the draftsman. The parties acknowledge and agree

5

> that this Agreement has been *reviewed, negotiated and accepted by all parties and their attorneys* and *shall be construed and interpreted* according to the *ordinary meaning of the words used* so as fairly to accomplish the purposes and intentions of all parties hereto.

(Merger Agreement, § 11.1).

### F.   The Parties Dealings After the Acquisition

The parties both argue that the language of the Merger Agreement is clear, unambiguous and can be interpreted as a matter of law, yet both point to extrinsic evidence in support of their different interpretations of the Indemnity Provision and what the parties intended when they entered into the Merger Agreement.   For the most part, the parties do not dispute the facts set forth below.   Rather, the parties disagree as to whether this extrinsic evidence, including evidence of their dealings with each other and conduct after the acquisition, is relevant to the terms or interpretation of the Indemnity Provision contained in the Merger Agreement.

### 1.   Quintiles' Alleged Reaffirmation of the Indemnity Provision

After the merger, a dispute arose among Quintiles, WebMD and Envoy concerning certain matters unrelated to the present dispute.   As of October 12, 2001, those parties entered into a Settlement Agreement concerning that dispute.   Although the dispute was unrelated to the present case, according to Envoy and Federal, Quintiles reaffirmed its unconditional indemnity obligation with respect to the Envoy Securities Litigation in Paragraph 12(d)(4) of the Settlement Agreement.   (Doc. 18, at 4).   Specifically, Paragraph 12(d)(4) of the Settlement Agreement provides:

> Nothing contained in this Section 12 shall release, acquit, discharge, waive, relinquish, diminish or modify . . . Quintiles' indemnification obligation in connection with the Envoy class action litigation, as provided in Section 8.16 of the Merger Agreement and in Schedule 8.16 of the Envoy Disclosure Letter delivered to Quintiles in connection with the Merger Agreement**.**

(Compl. ¶ 1.)  Plaintiffs point to this separate agreement entered between the parties before defense costs were first presented to Quintiles, as support for their contention that Quintiles' promise to indemnify Envoy in the Merger Agreement was not intended to be secondary to insurance coverage or otherwise conditional in any way.   Yet, in December 2001, Envoy asked Quintiles to perform under the Indemnity Provision by reimbursing defense costs that Envoy had incurred as of that date in the Envoy Securities Litigation and Quintiles refused.   (Pls' Statement of Undisp. Facts ¶ 17 (Doc. No. 19).)

6

**2. Envoy's Correspondence Allegedly Expressing Understanding that Indemnification was Secondary to Insurance.**

All parties to the Envoy Securities Litigation were aware of the existence of the Federal Policy and its limits and according to Quintiles, all parties to the Merger Agreement treated the Federal coverage as primarily liable for coverage of that litigation. Specifically, on February 28, 2002, two months after Quintiles first refused to reimburse Envoy's defense costs in December, 2001, James Mercer, an attorney for WebMD and Envoy, sent an email to Robert M. Pozin, a representative of Federal, which referenced the parties' course of performance over the years:

> Envoy has looked to and will continue to look to the Federal Insurance Company as its primary source of insurance. The fact that WebMD, as the parent entity, received an indemnity to protect Envoy from any loss arising from the Envoy Class Action Litigation should not alter what the relationships have been as this matter progressed over the past several years.

(Doc. No., 62, at 6; Doc. No. 63, at ¶ 15.)

Yet, on March 1, 2002, after a telephone conversation with an attorney for Federal, Mr. Mercer sent another e-mail clarifying his February 28th e-mail. In the second e-mail, Mr. Mercer stated, "WebMD and Envoy have no position with respect to the relative obligations between Quintiles and Federal." (Doc. No. 63, at ¶ 16.)

**G. Defense and Settlement Costs Associated With the Envoy Securities Litigation**

As stated previously, after the merger, Envoy kept both Federal and Quintiles informed about and involved in the progress of the underlying Envoy Securities Litigation. Although Quintiles initially refused to pay any of Envoy's defense costs, it ultimately reimbursed Envoy for $500,000 in defense costs, an amount equal to the Deductible under Federal's Policy. However, Quintiles refused to pay any additional defense costs, or to pay any settlement amount, if such amounts were less than the $15 million limit of liability of the Policy. Although the Indemnity Provision, by its express terms, was not subject to, net of, or excess to the Policy or any other insurance, Quintiles took the position that any obligation it might have under the Indemnity Provision would not be triggered until the limit of liability of the Policy had been exhausted.

At the time the present case was filed in June 2003, Envoy had incurred more than $975,000 in defense costs and had reached an agreement in principle with the class plaintiffs to settle the Envoy Securities Litigation for $11 million (the "Settlement"). Quintiles had demanded that Envoy settle the Envoy

7

Securities Litigation for any amount less than $15 million. Envoy entered into the Settlement with the full knowledge and consent of Quintiles. Envoy demanded that Quintiles fund the Settlement and Quintiles refused.

Based on Quintiles' continued refusal to pay, Envoy requested Federal pay the defense costs in excess of $500,000 and fund the settlement of approximately $11 million. (Compl. ¶ 17). Plaintiffs claim that in order to protect Envoy's and Federal's interests and to ensure Envoy's dismissal from the Envoy Securities Litigation, Federal in good faith agreed to pay the settlement in full. In December 2003, the Settlement was approved by the District Court and settlement funds were dispersed in January 2005.

To date, Federal has paid more than $475,000 in defense costs, the amount incurred by Envoy in excess of the $500,000 deductible, which was paid by Quintiles, and $11 million to settle the Envoy Securities Litigation. However, Federal maintains that it agreed to pay the costs associated with the Envoy Securities Litigation, pursuant to a full reservation of rights under the Policy, and the Quintiles' agreement to indemnify Envoy and applicable law. (Compl. ¶ 18.)

H.      **Procedural Background**

On June 13, 2003, Plaintiffs Envoy and Federal filed a Complaint against Defendant Quintiles for breach of contract based on Quintiles' refusal to pay Envoy the costs to defend and settle a separate class action, the Envoy Securities Litigation despite Quintiles' agreement to indemnify Envoy "from any and Liabilities arising out of the . . . Envoy Securities Litigation," as set forth in the January 2000 Merger Agreement. (Doc. No. 1.) Plaintiffs seek recovery of the monies paid and to be paid to defend and settle the Envoy Securities Litigation. Federal joined Envoy in suing Quintiles based on Federal's right to subrogation under the Federal Policy.

At the time this lawsuit was filed in June 2003, the Envoy Securities Litigation was still pending before Judge Nixon. Although Envoy had presented the defenses costs and demanded payment from Quintiles based on the Indemnification Provision of the Merger Agreement, Quintiles refused to pay any costs beyond $500,000, the deductible amount for Envoy's director and officers insurance coverage provided by co-plaintiff Federal for the period of time of the alleged illegal actions (1996 to 1998). Up through and until the Envoy Securities Litigation settlement was paid in 2005, Quintiles continued to refuse to make any payments to

8

Envoy in excess of the $500,000 deductible, if such amounts were less than the $15 million limit of liability of the Federal policy. Plaintiffs subsequently filed their Motion for Summary Judgment and Memorandum in Support arguing that the plain and unambiguous language of the Merger Agreement established Quintiles' duty to indemnify Envoy for the Envoy Securities Litigation and there is no dispute that Quintiles' breached this duty under the Indemnity Provision by refusing to pay defense costs beyond $500,000 and costs to settle the litigation.

In response to Plaintiffs' Complaint, Defendant Quintiles filed a Motion to Dismiss, which was by order of this Court converted to a Motion for Summary Judgment. In support of its motion, Defendant Quintiles relies on a separate provision of the Merger Agreement, which required Envoy to maintain insurance policies held by Envoy and then in force. Based on that provision, Quintiles argues that the parties intended for the indemnification provision to apply *only after* the insurance policy coverage was exhausted and that it is entitled to summary judgment as a result. Quintiles also contends that regardless of the contract interpretation, it is entitled to summary judgment because: (1) Envoy has been fully reimbursed and has not suffered any real injury or damages; (2) any recovery by Envoy or Federal is barred by accord and satisfaction because Envoy accepted $500,000 from Quintiles; and (3) Federal has no standing to pursue its claim for contractual or equitable subrogation and (4) alternatively, Federal is not entitled to contribution, because the Merger Agreement contains a non-assignment provision. Alternatively, both parties argue that, at a minimum, the other party's motion must be denied because its interpretation either directly contradicts the explicit terms of the Merger Agreement or the parties' intent in entering into the Merger Agreement evidenced by extrinsic evidence.

This case was reassigned to this Court in late 2005. At the time the case was reassigned, discovery had been stayed and Plaintiffs' Motion for Summary Judgment and Defendant's Motion to Dismiss pending since July 2003, along with a motion for a consolidated hearing on those motions. Based on the amount of time that had elapsed and the fact that the Envoy Securities Litigation had been settled and dismissed since the filing of the Complaint and the motions, this Court vacated the Order staying discovery and the Order sealing the case, converted Defendant Quintiles' Motion to Dismiss to a Motion for Summary Judgment (denying its ripeness arguments as moot) and invited the parties to submit any necessary supplemental

briefing on the cross-motions for summary judgment. The case was then referred to Magistrate Judge Griffin for case management.

Between December 2005 and January of this year, the parties submitted supplemental briefing on their motions. In addition, in mid-January Defendant Quintiles filed an Answer and Counterclaims against both Plaintiffs.[1] The Court heard oral arguments on the parties' cross-motions on April 17, 2006 and the motions were taken under advisement.

## III.  STANDARD OF REVIEW AND CHOICE OF LAW

### A.  Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the burden of showing an "absence of a genuine issue of material fact as to an essential element of the nonmovant's case." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The moving party may do this by providing affidavits or other proof or by showing lack of evidence on an issue for which the non-moving party will have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party must then present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby,Inc., 477 U.S. 242, 248 (1986).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). The court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Westfield Ins. Co. v. Tech Dry, Inc., 336 F.3d 503, 506-07 (6th Cir. 2003); Taft Broad. Co., 929 F.2d at 248. Accordingly, when a court

---

[1]Quintiles also named WebMD, the company that acquired Envoy from Quintiles by the Merger Agreement in its Counterclaims, but WebMD is not currently a party to the present lawsuit. The counterclaims are not pertinent to the resolution of these motions, except that Judge Griffin entered an Order in February giving WebMD 30 days from the date the Court rules on the pending dispositive motions to answer Quintiles' counterclaims.

denies summary judgment to one party on the ground that it is granting summary judgment to another party, the denial of summary judgment is based on a legal conclusion rather than the district court's finding of a genuine issue of material fact.  Black v. Roadway Express, Inc., 297 F.3d 445, 448 (6th Cir. 2002).

B.    **Choice of Law**

The parties agree that North Carolina law controls the Merger Agreement containing the Indemnity Provision at issue in this case.  The elements for breach of contract are the same under North Carolina law as Tennessee law.  Plaintiffs must show (1) the existence of a valid contract, (2) breach of the terms of the contract and (3) damages resulting from the breach.  Poor v. Hill, 530 S.E.2d 838, 843 (N.C. App. Ct. 2000) (citing Jackson v. Carolina Hardwood Co., 463 S.E.2d 571, 572 (N.C. App. Ct. 1995)).  Under the general rules of contract construction, where an agreement is clear and unambiguous, the court must enforce the contract as written and no genuine issue of material fact exists, therefore, summary judgment is appropriate.  Carolina Place Joint Venture v. Flamers Charburgers, Inc., 551 S.E.2d 569, 571 (N.C. Ct. App. 2001); Hagler v. Hagler, 354 S.E.2d 228, 234 (N.C. 1987) (internal citations omitted).

Moreover, an indemnitor's liability depends on the terms of the contract as construed by the general rules of contract construction; summary judgment may therefore properly resolve claims pertaining to the interpretation of a contractual indemnification provision.  Carolina Place Joint Venture, 551 S.E.2d at 571; Cater v. Barker, 617 S.E.2d 113, 116-117 (N.C. Ct. App. 2005); Clark Contr. Group, Inc., v. Eagle Amalgamated Service, Inc., 190 F. Supp.2d 1077, 1081-82 (W.D. Tenn. 2002) (granting summary judgment to indemnitee under contractual indemnity clause).

IV.    **DISCUSSION**

Both parties argue in cross-motions that they are entitled to judgment as a matter of law because the language in the Merger Agreement is clear and can be interpreted as a matter of law.  Plaintiffs Envoy and Federal move for summary judgment against Quintiles solely on the question of Quintiles' liability for breach of contract.  (Doc. No. 18, at 7; Doc. No. 64, at 2.)  Plaintiffs argue in their motions and in opposition to Quintiles' motion, that the plain and unambiguous language of the Merger Agreement established Quintiles' duty to indemnify Envoy for the Envoy Securities Litigation and that Quintiles' breached this duty under the Indemnity Provision by refusing to pay defense costs beyond $500,000 and costs to settle the litigation.

11

Therefore, as discussed below in Section B, Envoy and Federal, as Envoy's subrogee, contend that the only issue is a question of contract interpretation, and the Court should enforce the contract as written and grant summary judgment to plaintiffs.

On the other hand, Quintiles contends not only that it is entitled to judgment as a matter of law as to the contract claims based on the plain language of the contract, as discussed in Section B below, but also that it is entitled to summary judgment or at least partial summary judgment as to one or both of the parties for the following reasons:

1.      Federal cannot recover from Quintiles because the Non-Assignment provision in the Merger Agreement precludes Federal from enforcing Envoy's rights under subrogation;

2.      Envoy cannot recover from Quintiles for breach of contract because Federal has compensated Envoy for all of the alleged "damages";

3.      Envoy accepted $500,000 from Quintiles in full satisfaction of any amounts potentially owed below Federal's $15 million limit, and therefore, neither Envoy or Federal can recover due to accord and satisfaction;

4.      Federal cannot recover from Quintiles in contribution because the obligations of the two parties are disparate, arising from two entirely different contracts.

As discussed below, Quintiles' first three arguments are relatively straightforward questions of law and are easily disposed of by the Court. Further, Quintiles' fourth argument for summary judgment is based on Federal's claim for contribution, which was presented by Federal as an alternative claim for recovery, and because the Court finds that Federal is entitled to judgment as a matter of law as to its subrogated claims for breach of contract, Quintiles' motion as to Federal's claims for contribution is moot. Accordingly, Quintiles' motion for summary judgment as to Federal's claims for contribution requires no discussion and is denied. (Doc. No. 62, at 16-17; Doc. No. 32, at 16-18; Doc. No. 68, at 11-12.) The Court will now address Quintiles' first three arguments for summary judgment.

A.      Whether Envoy and/or Federal Is Barred From Recovering From Quintiles For Breach of Contract Regardless of Court's Interpretation of the Merger Agreement

Defendant Quintiles has set forth several specific arguments in support of its contention that it is entitled to judgment as a matter of law and therefore, Envoy and Federal's claims should be dismissed. Quintiles first argues that regardless of how the Merger Agreement is interpreted or the parties' intent in entering into the Merger Agreement, neither Envoy or Federal can recover from Quintiles for breach of

contract.  Therefore, before the Court considers the main issue in this case, whether Quintiles breached its promise to indemnify Envoy for any and all Liabilities arising out of the Envoy Securities Litigation by refusing to pay the defense and settlement costs over $500,000, the Court must first consider whether Quintiles is entitled to judgment as a matter of law regardless of its promise to indemnify Envoy.  Each of Quintiles' arguments is considered below.

### 1.    The Effect of the Non-Assignment Clause

Quintiles contends that Federal has no standing to assert claims for contractual subrogation under the Merger Agreement because the agreement contains an explicit Non-Assignment provision (§ 11.6) which bars Federal's claim.  (Doc. No. 26, at 8-9; Doc. No. 62., at 14-15; Doc. No. 68. at 9-11.)  Specifically, Quintiles points to the Merger Agreement and the non-assignment provision that states that there is no assignment of rights without prior written consent of the parties and that nothing in the Merger Agreement intended to confer any rights by the Merger Agreement whether by "operation of law or otherwise."  Quintiles argues that because subrogation is an equitable assignment under applicable law, neither contractual nor equitable subrogation is available to Federal.  Investors Title Co. v. Herzig, 413 S.E.2d 268, 272 (N.C. 1992).

Plaintiffs, in response, contend that the non-assignment provision in the Merger Agreement has no bearing on Federal's right either to either contractual or equitable subrogation.  (Doc. No. 68, at 10.)  Plaintiffs argue that the law is clear that "the remedies of subrogation and assignment" are "different and distinctive rights and remedies."  Payne v. Buffalo Reinsurance Co., 317 S.E.2d 408, 410 (N.C. Ct. App. 1984).  According to plaintiffs, subrogation means substitution, not assignment or transfer.  Specifically, Plaintiffs argue that "[s]ubrogation operates only to secure contribution and indemnity; whereas, an assignment transfers the whole claim . . . ."  Id.  Therefore, according to Plaintiffs, Federal's claims arise under the "equitable remedy" of subrogation (by way of contract or operation of law), and therefore, Federal "steps into place of another [Envoy] and takes over the right to claim monetary damages to the extent that [Envoy] could have [under the Merger Agreement]."  Payne, 317 S.E.2d at 410.

The right of subrogation is purely derivative.  Generally, the doctrine of subrogation is defined as "an equitable remedy in which one steps into the place of another and takes over the right to claim monetary damages to the extent that the other could have."  Payne, 317 S.E.2d at 410; accord Planters Gin Co. v.

13

Federal Compress & Warehouse, Co., Inc., 78 S.W.3d 885, 891 (Tenn. 2002); Wimberly v. Am. Cas. Co., 584 S.W.2d 200 (Tenn. 1979); Peek v. Wachovia Bank & Trust Co., 86 S.E.2d 745, 755 (N.C. 1955) (by undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the subrogee is equitably subrogated to the claimant and succeeds to the subrogor's rights against the obligor).  On the other hand, "an assignment is the formal transfer of property or property rights."  Payne, 317 S.E.2d at 410. Despite Quintiles' assertion to the contrary, it is well settled under both Tennessee and North Carolina law that a party's rights derived by subrogation, whether by contract or operation of law, and the remedies available to subrogee are different and distinct from a party's rights and available remedies derived by assignment.[2]

 In cases involving insurance, like the case at bar, subrogation takes the form of an insurer's right to be put in the position of the insured, whether by express contract or operation of law, in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid.  Payne, 317 S.E.2d, at 410-11; York v. Sevier Co. Ambulance Auth., 8 S.W.3d 616, 619-620 (Tenn. 1999) (citations omitted).  Subrogation rights in this context are based on two fundamental premises: (1) that an insured should not be allowed double recovery for the same loss, which would result if permitted to recover both from the insurer and the wrongdoer; and (2) that the wrongdoer should compensate the insurer for payments the insurer made to the insured.  See Wimberly, 584 S.W.2d at 203; York, 8 S.W.3d at 619. Therefore, the subrogated insurer is said to "stand in the shoes" of its insured, because it has no greater rights that the insured and is subject to the same defenses assertable against the insured.  J&B Slurry Seal Co., 362 S.E.2d 812, 819-20 (N.C. App. Ct. 1987); Payne, 317 S.E.2d, at 410-11.  Accordingly, the Court finds that although the provision of the Merger Agreement bars Envoy from assigning its rights under the agreement without consent, it does not bar a party from enforcing its subrogated rights.

 Subrogation rights are categorized as "either the right of conventional subrogation – that is,

---

 [2]Plaintiffs contend that Federal is proceeding on its right of subrogation granted to it by the insurance policy and by equity - not by an assignment by Envoy of its rights under the Merger Agreement.  Moreover, because both Envoy and Federal were headquartered in Tennessee at the time the Policy was issued, at a minimum, Federal is entitled to subrogation rights under Tennessee law.  (Doc. No. 18 at n. 4; Doc. No. 64, at 6.)  Yet, because Federal is subrogated to Envoy's rights under a contract governed by North Carolina law, whether Federal can succeed on its claim for breach of contract is clearly governed by North Carolina law.

14

subrogation by agreement between the insurer and the insured – or the right of equitable subrogation, by operation of law upon the payment of the loss." Milwaukee Ins. Co. v. McLean Trucking Co., 125 S.E.2d 25, 29 (N.C. 1962). In the present case, Envoy claims that Federal is subrogated to the rights of Envoy both contractually, under the terms of the Federal Policy, and equitably, because it paid the entire loss on behalf of Envoy. (Pls' Pts & Auths. Supp. Mot. Summ. J., at 11-12). The Court's analysis of whether a party is entitled to subrogation of rights is the same under Tennessee or North Carolina law.

It is undisputed that Federal paid Envoy's defense and settlement costs pursuant to obligations under the insurance policy, which also contained a provision specifically providing that Federal would be subrogated to the extent of its payments to Envoy's right of recovery. Therefore, contrary to Quintiles' assertion, Federal's rights are not derived from an "assignment" of rights under the Merger Agreement, but from a separate contract between Federal and Envoy providing that Federal may step into Envoy's shoes to recover costs it has incurred for Envoy. J&B Slurry Seal Co., 362 S.E.2d at 819-20; Payne, 317 S.E.2d at 410-11. Moreover, because the Court finds that Federal is entitled to bring its claims against Quintiles based on its right of conventional subrogation under the Federal Policy, it is not necessary to consider whether the non-assignment provision of the Merger Agreement would prohibit claims based on equitable subrogation by operation of law.[3]

Accordingly, the Court concludes that Quintiles' argument that Federal has no standing to assert claims for contractual subrogation is without merit, and the non-assignment provision of the Merger Agreement has no bearing on Federal's right to recover the costs paid on behalf of Envoy under the Federal Policy. Based on the subrogation provision of the Federal Policy, it is clear that Federal is entitled to conventional subrogation to Envoy's claims against Quintiles for breach of the Indemnity Provision of the Merger Agreement and to recover the costs it incurred on behalf of Envoy if Quintiles did in fact breach the agreement. The Court, therefore, denies Quintiles' motion for summary judgment as to Federal's claims for

_____

[3]Although the Court acknowledges that the non-assignment provisions of the Merger Agreement specifically prohibit assignment "by operation of law or otherwise," it would not likely change the Court's analysis of Federal's claims if they were based only on equitable subrogation. Regardless of whether Federal's claims are based on conventional or equitable subrogation, rights derived from subrogation and rights derived from assignment are distinctively different in scope and substance, and the Court cannot conclude that the non-assignment provision in the Merger Agreement precludes Federal's right to equitable subrogation as a matter of law.

breach of the Indemnity Provision based on the non-assignment provision of the Merger Agreement.

> **2.** **Whether Envoy's Breach of Contract Claims Survive Summary Judgment If Envoy Cannot Show That It Has In Fact Been Damaged or Injured by Quintiles' Alleged Breach of the Merger Agreement.**

Quintiles argues that it is entitled to summary judgment as to Envoy's claims because Envoy admits in its Complaint that it has been fully compensated for these costs. (Doc. No. 26, at 7; Doc. No. 62, at 19; Doc. No. 68. at 15-16.) Specifically, Quintiles paid $500,000 and Federal paid any and all amounts in excess of the $500,000 insurance deductible. Quintiles contends that Envoy cannot seek recovery from Quintiles for amounts already recovered from Federal, and Envoy has not presented any evidence to show that it has in fact suffered any injury or damages from Quintiles' alleged breach of the Merger Agreement.

In response, Envoy argues that it is not precluded from asserting a breach of contract claim against Quintiles merely because Envoy's liability insurer, Federal, has paid the defense costs and settlement. (Doc. No. 68, at 15.) Envoy points to law that recognizes that even if an insurer has reimbursed its insured, the insurer can bring suit thereafter in the insured's name. Envoy contends that it does not seek a double recovery, but merely wants Quintiles to pay the money plus interest it owes under its indemnity obligation to the party to which it is owed. Id. Further, Envoy argues that the ultimate judgment can reflect a single recovery to make both parties whole and put Envoy back in position it would have been, but for Quintiles' breach of the contract.

Under North Carolina law, a plaintiff must show that the alleged breach caused its injury in order to maintain an action for breach of contract and recover damages. R.E. Menzel, M.D. v. Metrolina Anesthesia Assoc., P.A., 310 S.E.2d 400, 404 (N.C. Ct. App. 1984). Although Envoy's allegations that Quintiles' breach caused it damages by depleting its insurance coverage is sufficient to state a claim for breach of contract and survive Quintiles' original motion to dismiss, there is no evidence in the record that Envoy has sustained any actual damages. Envoy argues it should not be dismissed as a party because it might be entitled to nominal damages for depletion of its insurance coverage, yet Envoy concedes that Federal has compensated it for the costs incurred as a result of Quintiles' alleged breach of the Merger Agreement. Moreover, as discussed above, there is no question that Federal is contractually subrogated to Envoy's rights under the Merger Agreement and therefore, Federal is entitled to assert the rights and claims that Envoy has against Quintiles.

Moreover, as a general rule, "[f]or a breach of contract the injured party is entitled to compensation therefor to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed." First Union Nat. Bank of North Carolina v. Naylor, 404 S.E.2d 161, 164 (N.C. Ct. App. 1991) (internal citations omitted). A review of the record in the case at bar clearly shows that Envoy has failed to present any evidence to show that it actually incurred any costs associated with claims that were not covered by insurance as a result of the alleged depletion of insurance coverage for the October 1, 1996 to October 1, 1998 policy period. It is undisputed that any injury to Envoy from Quintiles' alleged breach was compensated fully by Federal, and there is no evidence that Envoy has suffered an actual injury, damage, or loss as a result of Quintiles' alleged breach. Therefore, the Court finds that Envoy is in the same position it would have been in if the contract had been performed.

On the other hand, Federal, as an insurer-subrogee of Envoy, suffered the actual injury when it paid the entire loss suffered by Envoy as a result of Quintiles' refusal to pay the costs of the Envoy Securities Litigation and has substantive rights in the present case. Despite Envoy's contention that it is a necessary party to the case, Envoy has repeatedly emphasized the point that "Quintiles should not have to pay the amounts twice" and that it is not seeking double recovery or a windfall. Accordingly, the Court must conclude that Federal is the only real party in interest to the breach of contract claim against Quintiles, and Fed. R. Civ. Proc. 17(a) requires that Federal sue in its own name. United States v. Aetna Cas. & Sur. Co.,338 U.S. 366, 380-81 (1949); Land v. Tall House Bldg. Co., 563 S.E.2d 8, 11 (N.C. App. Ct. 2002) ("[w]here the insurance paid the insured covers the loss in full, the insurance company, as a necessary party plaintiff must sue in its own name to enforce its right of subrogation . . ." (citing Burgess v. Trevathan, 72 S.E.2d 231, 233 (1952)); Kentucky Nat. Ins. Co. v. Gardner, 6 S.W.3d 493, 499 (Tenn. CT. App. 1999) (citing Travelers Ins. Co. v. Williams, 541 S.W.2d 587, 590 (Tenn.1976)); Univ. Motors, Inc. v. Durham Coca-Cola Bottling Co., 266 N.C. 251, 256, 146 S.E.2d 102, 106 (N.C. 1966); see also Parnell v. Nationwide Mut. Ins. Co., 263 N.C. 445, 449, 139 S.E.2d 723, 726 (N.C. 1965) (where plaintiff's insurer had paid in full, and plaintiff's policy had a subrogation clause, plaintiff was not a "real party in interest").

Although Envoy has stated a claim for breach of contract and alleges that it has been injured, Envoy has presented no evidence either in the written record or during oral argument to show that Envoy has

17

actually suffered any injury or is somehow entitled to recover damages.  Therefore, the Court finds that Federal, as a subrogee to Envoy, is the only real party in interest to the breach of contract claim against Quintiles.  Accordingly, Quintiles' Motion for Summary Judgment as to Envoy is granted.

> **3.      Whether Envoy's Acceptance of $500,000 in Payments from Quintiles, Representing the Amount of the Federal Policy's Deductible, Was in Accord and Satisfaction of Any Obligation of Quintiles to Plaintiffs.**

Quintiles also argues that Envoy and Federal cannot recover in this case based on the defense of accord and satisfaction, and therefore, Quintiles is entitled to judgment as a matter of law.  (Doc. No. 62, at 17-19).  Quintiles contends that the check sent to Envoy on October 9, 2002 in the amount of $500,000 enclosed a letter stating that the amount paid "represents Quintiles' maximum obligation" until the insurance policy is exhausted and that Quintiles "will not make further payments."  (Id.).  According to Quintiles, the company's intent was that the check serve as full payment of the disputed claim, regardless of any disclaimers Envoy may have communicated, and that intent is controlling, even if the legal effect of accepting the check was not understood by Envoy.  (Id. (citing Zanone v. RJR Nabisco, Inc., 463 S.E.2d 584, 587-88 (N.C. Ct. App. 1995))).

Plaintiffs contend that Quintiles' argument ignores several critical facts that are self-evident from the letter and defeat accord and satisfaction as a matter of law.  (Doc. No. 68., at 12-15).  Plaintiffs rely on the cases cited by Quintiles to show that in order for there to be an accord and satisfaction, there must be an agreement that the payment work as both a *full payment of all indebtedness* and a "final" resolution of the entire dispute.  (Id. at 12 (citing Zanone, 463 S.E2d at 589).  According to Plaintiffs, it is clear that no such finality existed.  In fact, the text of Quintiles' own letter shows that the dispute remained ongoing:

> As with the previous payment, we forward this check maintaining Quintiles' full reservation of rights with respect to all parties.  Quintiles expressly reserves all of its rights to seek reimbursement of all or part of this amount.  Quintiles does not waive any grounds for challenging the existence or extent of any obligation to pay these sums, including, but not limited to, those grounds set forth in prior correspondence.  Quintiles reserves its rights to contest, challenge, or otherwise dispute the validity and enforceability of the indemnification provision under which ENVOY and WebMD are asserting their claims.

(Doc. No. 68. at 13, citing Russell Aff. Ex. 4).  In addition, Plaintiffs point out that the eventual $11 million total settlement cost of the securities litigation had not yet been reached at the time Quintiles tendered the $500,000 check.  Therefore, there was no way to know to what extent Quintiles would remain involved. (Id.

18

at 12.)  Moreover, the letter enclosed with the $500,000 check states that it is "payment in full for the invoices attached to this letter," not for all fees that Envoy had incurred or would incur up until settlement.  (Id. at 13.)

When sufficient facts exist to support the affirmative defense of accord and satisfaction, it is an absolute bar to plaintiffs' assertion of breach of contract.  N.C. Monroe Construction Co. v. Coan, 228 S.E.2d 497, 501 (N.C. Ct. App. 1976).  The existence of accord and satisfaction is normally a question of fact, but "where the only reasonable inference is existence or non-existence, accord and satisfaction is a question of law and may be adjudicated by summary judgment when the essential facts are made clear of record."  Id. The facts surrounding the delivery of the $500,000 check in the present action are not contested, only their legal significance remains in dispute.  Thus, the issue of whether an accord and satisfaction existed in the present case is ripe for summary judgment.  See Zanone, 463 S.E.2d 584, 587 (N.C. Ct. App. 1995).  As discussed above, Federal's right to maintain a breach of contract claim against Quintiles is derived from its subrogation to Envoy's rights against Quintiles, and Federal's claims are subject to the same defenses assertable against Envoy.  Therefore, if Envoy's acceptance of the $500,000 payment was in accord and satisfaction of Quintiles' obligation under the Indemnity Provision, Federal's claims are barred and Quintiles is entitled to judgment as a matter of law as to those claims.

An "accord" is an agreement whereby one of the parties undertakes to give or perform, and the other to accept what is offered, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or tort.  Sharpe v. Nationwide Mut. Fire Ins., 302 S.E.2d 893, 894 (N.C. Ct. App. 1983).  "Satisfaction" is the execution or performance of such agreement.  Id.  "Establishing an accord and satisfaction . . . as a matter of law requires evidence that permits no reasonable inference to the contrary and that shows the 'unequivocal' intent of one party to make and the other party to accept a lesser payment in satisfaction . . . of a larger claim."  Moore v. Frazier, 305 S.E.2d 562, 564 (N.C. Ct. App. 1983).

In the present case, Quintiles, by letter dated October 9, 2002, offered Envoy the $500,000 payment stating that it was "payment in full for the invoices attached to this letter."  According to Quintiles, the letter clearly established its intent that the $500,000 payment be treated as an accord.  Yet, as Plaintiffs point out, it did not say that it was payment in full for all costs Envoy had incurred, nor did it specifically state that it was a final payment for fees that Envoy would incur thereafter whether in defense or settlement of the Envoy

19

Securities Litigation. (Doc. No. 68., at 14-15). Moreover, Quintiles reserved the right to recover any and all sums it paid to Envoy. The Court agrees with Plaintiffs that "one cannot tender, subject to a reservation of rights, a payment of a partial claim and expect that payment to constitute an accord and satisfaction of th entire claim. Nor could the party cashing the check." (Doc. No. 68., at 15).

Further, based on the disclaimers in the letter and the parties' actions both before and after the payment was tendered, it is clear that Quintiles cannot establish that Envoy intended to accept the $500,000 payment in satisfaction of the debt. Quintiles' argument here seems to be a last-ditch effort to avoid dealing with the interpretation of the Merger Agreement and its obligation under the indemnification provision. Accordingly, based on the facts and legal arguments presented by the parties, it cannot be said that Envoy's acceptance of Quintiles' partial payment of the defense costs was an accord and satisfaction as a matter of law. Therefore, the Court holds that Quintiles' Motion for Summary Judgment on Plaintiffs' breach of contract claims based on accord and satisfaction is denied.

**B.      Whether Quintiles' Obligation Under the Indemnity Provision of the Merger Agreement Was Express and Unconditional or Whether It Was Secondary and In Excess to Insurance Coverage Provided by Federal's Policy**

The only remaining issue in this case is whether Quintiles' breached its obligation to indemnify Envoy under the Indemnity Provision. Apparently there is no dispute that Envoy and Quintiles entered into a valid contract – the Merger Agreement – or that the parties agreed to include the Indemnity Provision as part of that agreement. As discussed above, on its face, the Indemnity Provision expressly obligates Quintiles to indemnify Envoy for *all defense and settlement costs* related to the Envoy Securities Litigation without any mention or reference to insurance coverage or other provisions within the Merger Agreement. Moreover, as the Court has already indicated, there is no question that Federal, as a subrogee to Envoy's rights under the Merger Agreement, is entitled to step into Envoy's shoes to recover the defense and settlement costs if the Court finds that Quintiles has breached its obligation under the Indemnity Provision. Yet, because the Indemnity Provision is only one provision contained within the larger agreement between the parties, there is a question as to how, if at all, the other provisions of the Merger Agreement relate to the Indemnity Provision and Quintiles' obligation under the provision. Therefore, this case now presents a single legal issue to be decided by the Court: whether Quintiles breached the Merger Agreement by refusing to indemnify

Envoy for costs beyond the $500,000 insurance deductible.

To resolve this issue the Court need only answer two questions: (1) whether, as Federal argues, the language of the Indemnity Provision obligating Quintiles to indemnify Envoy "from any and all Liabilities arising out of the . . . Envoy Securities Litigation," expressed the intent of the parties to the Merger Agreement and Quintiles' promise should be enforced as written, without regard to ambiguous provisions regarding insurance or extrinsic evidence related to the parties' understanding at that time; and (2) whether, as Quintiles argues, the Court must consider the Indemnity Provision in light of the provision requiring Envoy to maintain director and officer insurance coverage, and find that the parties intended for Quintiles to indemnify Envoy only for costs in excess of Federal's insurance coverage.

If, as Federal contends, Quintiles' obligation to indemnify Envoy under the Indemnity Provision is primary and unconditional then Quintiles' refusal to pay the defense and settlement costs beyond the $500,000 insurance deductible would clearly be a breach of that agreement. On the other hand, if, as Quintiles contends, Quintiles' obligation to indemnify Envoy for the Envoy Securities Litigation is not unconditional, but is instead in excess of and secondary to the coverage provided by Federal's Policy, then Quintiles would be entitled to judgment as a matter of law and dismissal of the present case against it. The Court will now consider each party's individual arguments.

### 1. Plaintiff's Motion For Summary Judgment – Interpretation of the Indemnity Provision

It is well settled that ordinary rules of contract construction apply to indemnity agreements, such as the Indemnity Provision in the present case. Therefore, the Court will apply the principles governing interpretation of contracts when construing the Merger Agreement and the Indemnity Provision contained therein. Carolina Place Joint Venture, 551 S.E.2d at 571; Clark Contr. Group, Inc., v. Eagle Amalgamated Service, Inc., 190 F. Supp.2d 1077, 1081-82 (W.D. Tenn. 2002) (granting summary judgment to indemnitee under contractual indemnity clause). Under North Carolina law, "[t]he controlling purpose of the court in construing a contract is to ascertain the intention of the parties as of the time the contract was made, and to do this consideration must be given to the purpose to be accomplished, the subject-matter of the contract, and the situation of the parties." Bald Head Island Utilities, Inc., v. Village of Bald Head Island, 599 S.E.2d 98, 100 (N.C. Ct. App. 2004). Yet, "[w]here the language of a contract is plain and unambiguous,

21

construction of the agreements is a matter of law; and the court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written." DeMent v. Nationwide Mutual Ins. Co., 544 S.E.2d 797, 799-800 (N.C. Ct. App. 2001) (citations omitted).

In light of these principles, Federal's argument for summary judgment and its response to Quintiles' cross-motion is simple and straightforward – the clear and unambiguous Indemnity Provision obligates Quintiles to indemnify Envoy "from any and all Liabilities arising out of . . . Envoy Securities Litigation, "and even if the Indemnity Provision is considered alongside other provisions of the Merger Agreement, the promise remains express and unconditional. (Doc. No. 18, at 10; Doc. No. 64, at 2-4). In response, Quintiles does not contend that the terms of the Merger Agreement are either unclear or ambiguous. Rather, Quintiles argues that regardless of the language of the Indemnity Provision, it was the intent of the parties to the Merger Agreement that the Quintiles' indemnity obligation apply only after the insurance coverage under the Federal Policy was exhausted, i.e., Envoy's costs related to the Envoy Securities Litigation totaled more than the policy limit of 15 million.

Federal, in response, refers the Court to the Merger Agreement and points out that there is no mention or reference either in the Indemnity Provision or anywhere else in the Merger Agreement that Quintiles' promise to indemnity is in excess of, subject to, or net of any insurance, nor is there any language suggesting that the parties intended for the Federal Policy to be primary to Quintiles' agreement to indemnify Envoy. (Doc. No. 18, at 13; Doc. No. 64, at 7). Moreover, as discussed further in Section 2 below, Federal points to the fact that the Federal Policy at issue was not the subject of the requirement to maintain insurance under Article 8.12(b), because it was not in effect at the time of the merger, having expired fourteen months earlier. (Doc. No. 43, at 9-11, Doc. No. 64, at 3-4). Therefore, according to Federal, regardless of any insurance coverage that may be available to Envoy to cover the same liability or any other liability under the Federal Policy or any other insurance policies, the clear and unambiguous Indemnity Agreement obligates Quintiles to indemnify Envoy for all costs arising out of the Envoy Securities Litigation and the Indemnity Provision should be enforced as written. (Doc. No. 43, at 10; Doc. No. 64, at 3-6).

Surprisingly, Quintiles does not specifically address Federal's point that the parties agreed on the language of the Merger Agreement and no where in the Merger Agreement did the parties mention or suggest

22

that they intended for Quintiles' obligation under the Indemnity Provision be limited or conditioned in any way. (Doc. No. 18, at 9; Doc. No. 38 at 3.)  Rather, Quintiles argues that the Court need only consider extrinsic evidence concerning the parties' intent and "course of performance" after the merger in order to ascertain the intent behind the Indemnity Provision.  (Doc. No. 62, at 20).  According to Quintiles, "[e]vidence regarding the parties' understanding, intent and course of performance, while being extrinsic evidence," is properly presented to the Court even though 'the words of the agreement at hand [may] seem clear and unambiguous.'"  (Id. at 20 (citing Jefferson-Pilot Life Ins. v. Smith Helms Mulliss & Moore, 429 S.E.2d 185, 193 (N.C. Ct. App. 1993).  Based on this assertion, Quintiles refers the Court to communications between the parties and their attorneys after the merger, as well as an affidavit by the attorney, John Russell, who signed the Merger Agreement on behalf of Envoy, as evidence that the parties actually intended for Envoy to look to Federal for its primary indemnification for the Envoy Securities Litigation, and agreed that Quintiles' obligation to indemnify Envoy would only begin after the exhaustion of Envoy's primary insurance.  (Doc. No. 38, at 9-11; Doc. No. 62, at 23).

In response, Federal contends that even if the Policy was the subject of Article 8.12(b), which it is not, neither Envoy's obligation to maintain insurance, nor the extrinsic evidence presented by Quintiles, renders the Indemnity Provision subject to conflicting interpretations or creates an ambiguity in the Merger Agreement.[4]  (Doc. No. 64, at 3-4).  Regardless, Federal contends the evidence presented by Quintiles is irrelevant and inadmissible.  Specifically, Federal points first to the integration clause of the Merger Agreement, which provides that the Merger Agreement (including the Indemnity Provision) "constitutes the entire agreement . . . and supersedes all prior arrangements or understandings with respect thereto, written

---

[4]The Court notes that Quintiles originally presented this argument in opposition to Plaintiffs' Motion for Summary Judgment, arguing that the Court could not resolve either Quintiles' Motion to Dismiss or Plaintiffs' Motion for Summary Judgment in Plaintiffs' favor without addressing the evidence of the parties' intent.  (Doc. No. 38, at 8-9).  Moreover, in its initial briefing, Quintiles argued that because it had advanced a reasonable alternative reading of the Merger Agreement, an ambiguity existed in the Merger Agreement and the Court must consider extrinsic evidence to determine the intent of the parties.  (Id.)  Quintiles now contends that if the Court agrees that the "terms of the Merger Agreement are clear, and that those terms clearly require Federal to bear primary responsibility for the Envoy Securities Litigation . . .," then there is no ambiguity and Quintiles is entitled to judgment as a matter of law.  Yet, on the other hand, "if the Court is willing to entertain Plaintiffs' interpretation as reasonable, then the Merger Agreement is ambiguous."  (Doc. No. 62, at 20, n. 12).  Because both parties base their motions on the assertion that the Merger Agreement is clear and unambiguous and the Court agrees that the terms are clear, the Court finds Quintiles' contention regarding ambiguity without merit.

or oral." (Doc. No. 43, at 5). Federal contends that because the Merger Agreement is a fully integrated writing, "Mr. Russell's self-serving affidavit concerning the parties' negotiations and his understanding is inadmissible parol evidence." (Id.). Further, Federal argues that absent any ambiguity in the Merger Agreement, extrinsic evidence regarding the parties' "course of performance" after the merger is not admissible. (Pls' Reply, at 5). According to Federal, the terms of the Merger Agreement are clear and do not require explanation, therefore all of the extrinsic evidence relied on by Quintiles is inadmissible.[5] (Pls' Reply, at 7; Doc. No. 64, at 4).

In construing the Merger Agreement, "[i]t must be presumed the parties intended what the language clearly expresses, and the contract must be construed to mean what on its face it purports to mean." Hagler v. Hagler, 319 N.C. 287, 294 (N.C. 1987); Hartford Accident & Indem. Co. v. Hood, 40 S.E.2d 198, 201 (1946) (internal citations omitted). The Court will also assume that the words the parties selected were deliberately chosen and therefore, are to be given their ordinary significance. Briggs v. Mills, Inc., 111 S.E.2d 841, 843 (N.C. 1960) (citations omitted); see also Corbin v. Langdon, 208 S.E.2d 251, 254 (N.C. Ct. App. 1974) ("Where the language is clear and unambiguous, the court is obliged to interpret the contract as written, and cannot, under the guise of construction, reject what the parties inserted . . ."). It is well-settled contract law that the Court will only look outside of the contract and consider extrinsic evidence presented by the parties

---

[5]The Court notes that Federal also refers the Court to the dealings between the parties after they entered into the Merger Agreement in support of its position that the Indemnification Provision is express and unconditional. Specifically, Federal argues that the unconditional nature of Quintiles' promise is apparent when viewed in light of a different indemnity promise, the Data Rights Indemnity, Quintiles made in the October 12, 2001 Settlement Agreement between Quintiles, WebMD and Envoy. (Pls' Mot. for Summ. J., at 13). According to Federal, the fact that Quintiles' agreement to indemnify Envoy under the Data Rights Indemnity was specifically conditioned to apply only in "net of any insurance proceeds any premiums paid or retentions with respect to such insurance," supports Federal's contention that if Quintiles had intended for the Indemnity Provision in the Merger Agreement to be "net" of or "excess" of insurance it would have specifically said so. Moreover, Federal also refers the Court to a specific provision within the 2001 Settlement Agreement, wherein Quintiles specifically provided that "[n]othing contained in Section 12 [of the Settlement Agreement] shall release, acquit, discharge, waive, relinquish, diminish or modify: Quintiles' indemnification obligation in connection with the ENVOY class action litigation, as provided in Section 8.16 of the Merger Agreement and in Schedule 8.16 of the Envoy Disclosure Letter delivered by Quintiles in connection with the Merger Agreement . . ." (Id. at 15). According to Federal, these subsequent dealings between the parties coupled with the undisputed fact that Quintiles agreed to language of the Indemnification Provision, despite the fact that Federal had reserved its right to deny coverage for the Envoy Securities Litigation, clearly show that the parties intended that Quintiles, not Federal, would be ultimately liable for the costs of the Envoy Securities Litigation. (Id., at 15). As discussed herein, the Court agrees that the language of the Merger Agreement is unambiguous, therefore, the evidence presented by Federal in support of its position, like Quintiles' evidence, is inadmissible extrinsic evidence.

to determine the intentions of the parties when entering into the contract if the language of the contract is ambiguous. See Bicket v. McLean Sec., Inc. , 478 S.E.2d 518, 521 (N.C. Ct. App. 1996) (recognizing that parol evidence as to the parties' intent and other extrinsic matters will not be considered if the language of the contract is unambiguous); Rosania v. Rosania , 422 S.E.2d 348, 350 (N.C. Ct. App. 1992) (court must interpret clear and unambiguous contractual language as written, and cannot look beyond contract terms to see parties' possible intent).

Although Quintiles apparently contends that no showing of ambiguity is needed in order for the court to look to extrinsic evidence, Quintiles cites to no authority supporting this proposition. (Defs' Memo Support Mot. Summ. J.& Opp. Pls' Mot. Summ. J., at 20, n.12). Rather, Quintiles relies first on the proposition that "evidence regarding the parties' understanding, intent and course of performance," although extrinsic, evidence "is properly presented to the Court even though 'the words of the agreement at hand [may] seem clear and unambiguous.'" (Def.'s Memo. Support Mot. Summ. J., at 20 (citing Jefferson-Pilot Life Ins. v. Smith Helms Mulliss & Moore, 429 S.E.2d 193, 185 (N.C. Ct. App. 1993). The case Quintiles cites, however, is clearly distinguishable from the case at bar. As discussed below, in order to consider the extrinsic evidence presented by Quintiles in the present case, the Court must first find a latent ambiguity in the contract.

Unlike the case at bar where the evidence presented to the court consists mainly of evidence regarding the parties' conduct after the merger, the extrinsic evidence presented to the court in Jefferson-Pilot Life Insurance consisted of "preliminary negotiations and surrounding circumstances," which was clearly relevant to determine what the parties intended when entering the contract. Jefferson-Pilot Life Ins., 429 S.E.2d at 185. Moreover, the court in Jefferson-Pilot Life Insurance specifically stated that it only considered the extrinsic evidence after finding a latent ambiguity in the contract. Id. More specifically, the court found that it was proper to consider the extrinsic evidence only because "the words of [the] written agreement are plain, but by reason of extraneous facts the definite and certain application of those words is found impracticable," and therefore, certain terms of the contract were ambiguous. Id. Further, although the court in Jefferson-Pilot Life Insurance considered the extrinsic evidence presented by the parties, the court ultimately held that "[b]ecause the question of the parties' intent exists, and extrinsic evidence is required to

determine the intent, summary judgment should not have been granted" for the defendant. Based on a careful review of the Merger Agreement and the record in the present case, the Court finds that the language of the Merger Agreement is clear and Quintiles' reliance on <u>Jefferson-Pilot Life Insurance</u> is misplaced. More specifically, contrary to Quintiles' assertion, the Court cannot conclude that the words contained in the Indemnity Provision and Insurance Provision are impracticable.

In a further attempt to introduce extrinsic evidence to the Court, Quintiles also argues that even if the terms of the Merger Agreement are clear, the fact that the parties have presented conflicting, yet reasonable interpretations of the Merger Agreement means that the Merger Agreement is ambiguous and that the Court should consider the extrinsic evidence in interpreting the agreement. (Def's Memo. & Opp. Pls' Mot. Summ. J., at 20). The Court is not aware of any authority, and Quintiles has not cited to any authority supporting Quintiles' proposition that a finding that the parties have each presented conflicting yet reasonable interpretations of the Merger Agreement somehow renders an otherwise unambiguous agreement ambiguous. In fact, the Court notes that if it were to apply this blanket rule and consider extrinsic evidence in each contract case where the parties presented conflicting interpretations of a clearly written agreement, the Court would be in direct conflict with the well-settled principle that "the court must enforce the contract as written." <u>See</u> <u>Weyerhauser Co.</u>, 127 S.E.2d at 543 ("when parties have dealt at arms length and contracted, the Court cannot relieve one of them because the contract has proven to be a hard one.") Accordingly, while the Court recognizes that the parties present conflicting interpretations of the Indemnity Provision contained with the Merger Agreement, a review of the agreement and the specific provisions at issue does not support a finding that the language of the Merger Agreement is either unclear or ambiguous.

Upon review of the record, the Court finds that, despite Quintiles' contention otherwise, the parties do not question or dispute the meaning of any term contained within the Merger Agreement. Rather, the only dispute between the parties is how, if at all, the different provisions within the Merger Agreement relate to each other. Therefore, the Court finds, contrary to Quintiles' contention, that the case at bar does not involve a question of the proper interpretation of ambiguous language, but instead involves a question of contract interpretation properly decided by the Court based the four corners of the Merger Agreement.

The Court, therefore, finds that the correspondence and other documents presented by Federal and Quintiles regarding the course of performance between the parties after the merger are irrelevant and inadmissible to vary the terms of the Merger Agreement. Accordingly, the Court must conclude that if Quintiles' obligation to indemnify Envoy is limited to the plain language and terms of the Indemnity Provision, there is no question that Quintiles refusal to indemnify Envoy would constitute a breach of its express language and Federal would be entitled to judgment as a matter of law. Yet, because the Indemnification Provision is only one provision within the Merger Agreement, the Court must also consider Quintiles' assertion that the Insurance Provision, a separate provision requiring maintenance of certain insurance coverage also contained within the Merger Agreement, limits or otherwise condition Quintiles' obligation under the Indemnification Provision.

### 2. Defendant's Motion for Summary Judgment – The Indemnity Provision, Read in Light of the Insurance Provision, Requires Finding that Quintiles' Indemnity Obligation Is Secondary and Excess to the Federal Policy.

As indicated above, although Quintiles argues that the Merger Agreement is clear and can be interpreted as a matter of law, Quintiles' reading of the plain meaning of the Merger Agreement is quite different from Federal's. (Doc. No. 62, at 8-14). Quintiles does not dispute the fact that the language of the Indemnity Provision is clear and unambiguous, nor the fact that there is no language or reference anywhere in the Merger Agreement specifically limiting Quintiles' indemnification obligation to only those costs not covered by the Federal Policy. Rather, in an apparent attempt to circumvent the unconditional language of the Indemnity Provision, Quintiles contends that because the Court must read the Indemnity Provision in light of the entire Merger Agreement and the agreement contains both the Indemnity Provision and a provision calling for Envoy to maintain insurance coverage, the Court must construe the Merger Agreement as placing on Federal the primary obligation for the Envoy Securities Litigation. (Doc. No. 62., at 20).

As discussed above, the Court must presume that "the parties intended what the language clearly expresses, and the contract must be construed to mean what on its face it purports to mean." Hagler v. Hagler, 354 S.E.2d 228, 234-35 (N.C. 1987). Yet, a court interpreting the language of a contract "must construe a contract as written and give effect to every part and provision whenever possible." See Gaskill v. Jeanette Enters., Inc., 554 S.E.2d 10, 12 (N.C. Appt. 2001) (internal citations omitted). Thus, according

27

to Quintiles, when construing the Indemnity Provision, the Court must consider the fact that the parties included both the Insurance Provision and the Indemnity Provision in the Merger Agreement. Specifically, Quintiles points to Article 8.12(b) of the Merger Agreement, requiring Envoy to maintain the general director and officer liability insurance that was in effect at the time of the merger, and contends that even though there is no mention of insurance coverage in the Indemnity Provision, Quintiles "knowingly bargained for the Federal Policy to be maintained so that it would cover losses arising from the Envoy Securities Litigation." (Doc. No. 62, at 12). Further, according to Quintiles, "[i]nterpreting the Merger Agreement as requiring Quintiles to be primarily liable for the Envoy Securities Litigation renders the provision for the maintenance of Federal's insurance meaningless and superfluous." (Id. at 14).

In response, Federal argues that none of the other provisions of the Merger Agreement, including the Insurance Provision, renders the express language of the Indemnity Provision or the Merger Agreement itself ambiguous or otherwise alters Quintiles' obligation to pay any liability incurred by Envoy in the litigation. (Doc. No. 64, at 3). More specifically, in response to Quintiles argument that "enforcing the indemnity will somehow fail to give effect to all of the terms of the Agreement," Federal points out that the provision requiring Envoy to maintain insurance applied only to the insurance policies in effect at the time of the merger, not the Federal Policy. (Doc. No. 68, at 9). Further, Quintiles contends that because the policy period of the Federal Policy expired fourteen months before the merger, it was impossible for Envoy to "maintain" the Federal Policy. (Doc. No. 64, at 3; Doc. No. 68, at 9). Federal also argues that even if Article 8.12(b) could be read to apply to the Policy at issue here, which it cannot, such a reading still would not render ambiguous the far more specific indemnity promise contained in Article 8.16. (Doc. No. 43, at 10-11).

Quintiles does not address Federal's point that the Policy at issue in this case was not actually in effect at the time of the merger. Instead, Quintiles points to the fact that "the only claim made under the claims-made Federal Policy was for the Envoy Securities Litigation, and this claim was made *and the Federal Policy had expired* far before the Merger Agreement existed" as support for its assertion that the parties intended the Federal Policy be primarily liable. (Doc. No. 62, at 14). Thus, according to Quintiles, if Federal's interpretation of the Merger Agreement is correct and Quintiles' obligation to indemnify Envoy is not in excess of the Federal Policy, "then the provision of the Merger Agreement providing for maintenance of Federal's

28

insurance is utterly meaningless." (Id.)  Further, Quintiles asks the Court to consider the "absurdity" that "the parties to the Merger Agreement intended simultaneously to require the Federal Policy be maintained in full effect and to absolve Federal of the only obligation it had pursuant to that policy," in its interpretation of the Indemnification Provision.  (Id.)

In fact, at the time Quintiles agreed to the specific Indemnity Provision it was entirely possible that a claim could be made against Envoy and WebMd, Envoy's new owner, that would be subject to the general coverage of the Federal Policy, but not subject to the specific Indemnity Provision for the Envoy Securities Litigation.  (Id. at 12).  Further, despite Quintiles' assertion to the contrary, enforcing the indemnity would not result in a "windfall" to Federal nor "absolve" Federal of its obligations.  Rather, Federal remains obligated for other claims subject to the Policy.  More importantly. "if Quintiles were financially unable to pay the indemnity, the Policy would still apply to the Envoy Securities Litigation subject to the limitations and exclusions in the Policy." (Id.).  Because Envoy and WebMD bargained for the specific Indemnity Provision to cover the risks associated with the Envoy Securities Litigation as Federal contends, "it plainly would not be absurd to enforce the indemnity as written."

The Court notes, as discussed above, that Quintiles does not cite to any authority in support of its proposition that the Court should go beyond the unambiguous language of an agreement and consider the parties' underlying motivations or business purposes in construing the agreement, nor does it respond to the numerous cases cited by Federal in its opposition to this argument.  Moreover, Quintiles does not substantively respond to Federal's argument that because Quintiles made a specific promise to indemnify Envoy for the costs associated with the Envoy Securities Litigation, the law requires that its promise be enforced before an insurer's general promise to provide liability coverage for nonspecific risks.  (Pls' Memo. Support Mot. Summ. J., at 18; Def.'s Memo. Support Mot. Summ. J. & Opp. Pl.'s Mot. Summ. J., at 12). Instead, Quintiles relies on the contention that "courts around the country have found that contracts containing both indemnification provisions and provisions calling for insurance to be maintained require the insurance to respond to a loss first, with the indemnification applying only after the insurance is exhausted." (Def.'s Mot. Summ. J., at 8.)

29

The case upon which Quintiles relies, primarily <u>Southside River Rail Terminal, Inc. v. CSX Transp., Inc.</u>, 2004 WL 2524158 (6th Cir. 2004) and <u>Tate v. Trialco Scrap, Inc.</u>, 745 F. Supp. 458 (M.D. Tenn. 1989), are inapplicable and, in any event, were not decided under North Carolina law. In <u>Tate</u>, the court, applying Tennessee law, considered a lease provision holding the lessee responsible for damage inflicted by him appeared to conflict with a provision requiring the lessor to purchase fire insurance. 745 F. Supp. at 474. In analyzing the lease, the court found that "[a]pplication of the modern rule that an agreement to purchase insurance will, absent clear contrary intent, be presumed to be for the mutual benefit of the parties mandates judgment in favor of the defendants." <u>Id.</u> Ultimately, the court determined that the general repair obligations within the lease were not a sufficient manifestation of an intent to preclude the insurance coverage obtained by the lessor from also applying to the negligent lessee who caused the loss. <u>Id.</u>

Similarly, in <u>Southside River Rail Terminal, Inc</u> , the Sixth Circuit, applying Ohio law, found that because the parties agreed to a general indemnification provision dividing liability between the two parties, as well as a provision requiring the indemnified party to *purchase* insurance, which specifically referenced the agreement to indemnify, the insurance policy was intended to be mutually beneficial to the parties. Therefore, the court held that the insurance provision should apply to cover the loss before the indemnification provision.

Relying on <u>Tate</u> and <u>Southside</u>, Quintiles argues that because the Merger Agreement specifically required Envoy to maintain the insurance that was in effect at the time of the January 2000 merger, the Federal Policy was to be maintained for the mutual benefit of the parties to the Merger Agreement and it must pay its full policy limits in defense and indemnification of the Envoy Securities Litigation before Quintiles has an obligation to indemnify pursuant to the Merger Agreement. (Doc. No. 62, at 10). In response, Federal reiterates its contention that the Federal Policy was not subject to Envoy's promise to maintain insurance in effect in January 2000. Further, according to Federal, even assuming Envoy's promise to maintain insurance involved the Federal Policy, the reasoning of <u>Southside</u> and <u>Tate</u> has no application in the context of the Merger Agreement. (Doc. No. 68., at 4). Federal also points out that even if the reasoning if <u>Southside</u> and <u>Tate</u> were somehow applicable to the case at bar, the law applied in the cases, Ohio and Tennessee, is not the law of North Carolina. (Doc. No. 68, at 5).

The facts of Tate and Southside, are distinguishable from those presented in the case at bar.  First, both Tate and Southside involved contracts, a lease and a rental agreement, respectively, wherein the parties agreed to divide potential liabilities for future, as distinct from existing, claims,  and agreed that one party would procure insurance specifically referencing the contract between the parties.  Second, in each case, the court examined the specialized relationship between the parties and determined that, absent some clearly expressed contrary intent, the agreement to obtain insurance was clearly intended to be for the mutual benefit of both parties.  See Tate, 745 F. Supp. at 473 (lessor promises to obtain insurance on leased property, the lessee's payments to the lessor under the lease agreement are presumed to pay for the insurance, so that the lessee should be considered a co-insured.)  Moreover, unlike the specific Indemnity Provision in the case at bar, both the contract in Tate and the contract in Southside involved indemnification provisions wherein each party agreed to indemnify the other for general risks associated with the agreement and the relationship between the parties.

Quintiles strains the principles of contract construction and the logic of these cases by arguing that because the Merger Agreement required Envoy to maintain insurance, Quintiles' promise to indemnify Envoy for the Envoy Securities Litigation is secondary to the Federal Policy.  First and foremost, unlike Tate and Southside, the Indemnity Provision in the Merger Agreement is not a general indemnification provision allocating liability among the parties to a lease.  Rather, the Indemnity Provision in this case is one provision in a comprehensive Merger Agreement among three parties, two of which are parties to this litigation, that requires Quintiles to indemnify Envoy for all costs associated with specific litigation.  Based on the facts in the record, it is apparent that the Insurance Provision, requiring Envoy to "maintain" insurance polices in effect at the merger, was included in the Merger Agreement for the benefit of all three parties to the agreement, not just Quintiles and Envoy.  Moreover, as discussed above, Quintiles concedes that the Federal's Policy at issue in this case had expired prior to the merger.

Based on the undisputed facts, it is clear that Envoy could not "maintain" the Federal Policy, as it had already expired and been replaced by a subsequent policy.  Further, even if Envoy's agreement to "maintain" insurance applied to the Federal Policy at issue, there is a distinct difference between a non-specific agreement to "maintain" insurance coverage and a specific agreement to "obtain" insurance to cover specific

risks covered by the contract. Therefore, even if the Court were to assume that the parties' agreed that Envoy would "maintain" insurance for the mutual benefit of all of the parties and Envoy was required to "maintain" the Federal Policy at issue, the Court finds that the specific, unconditional Indemnity Provision in the Merger Agreement is a clear expression that the parties did not intend for the insurance "maintained" by Envoy to cover Quintiles' obligation to pay the indemnified costs. See e.g., Tate, 745 F.Supp. at 473.

Under North Carolina law, an obligation to maintain insurance does not prevent an insurer from pursuing subrogation and does not prohibit a party to a contract from pursuing the other party to the contract. See, e.g., Winkler v. Appalachian Amusement Co., 79 S.E.2d 185, 191-92 (N.C. 1953); William F. Freeman, Inc. v. Alderman Photo Co., 365 S.E.2d 183, 185 (N.C. Ct. App. 1988). For these reasons, the court finds that even if the cases had been decided under North Carolina law, Quintiles reliance on Tate and Southside is misplaced. The considerations under Tate and Southside have no application to the relationship between Envoy and Quintiles, nor to the terms of the Merger Agreement. Accordingly, in light of the legal principles outlined above, the Court concludes that Quintiles' obligation to indemnify Envoy under the Indemnity Provision is primary and unconditional, and Quintiles' refusal to pay the defense and settlement costs beyond the $500,000 insurance deductible is clearly a breach of that agreement. Therefore, Federal is entitled to judgment as a matter of law and to recover the approximately $11.5 million paid out on behalf of Envoy.

## V. CONCLUSION

For the reasons set forth above and for good cause shown, the Court hereby DENIES Defendant Quintiles' Motion for Summary Judgment as to Plaintiff Federal, and GRANTS Quintiles' Motion as to Plaintiff Envoy, thereby dismissing Plaintiff Envoy from the case. Therefore, the Court GRANTS Plaintiff Federal's Motion for Summary Judgment and will award judgment in favor of Federal Insurance Company for the amount of the costs incurred by Federal to defend and settle the Envoy Securities Litigation, plus appropriate interest thereon. An appropriate Order will enter.

The Court hereby instructs the parties to consult with each other and reach an agreement as to the appropriate amount of damages, and to advise the Court as to such amount on or before 5:00 p.m. on Friday, May 19, 2006. In the event the parties are unable to reach an agreement as to the appropriate amount of

damages, each party shall submit a separate statement as to the appropriate amount of damages to the Court on or before the above date.  Thereafter, a final Order of Judgment will enter.

        Thomas A. Wiseman, Jr.
        Senior United States District Court Judge